UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x
DAVID PURCELL,                          :
                                        :
                      Plaintiff,        :
                                        :          **MEMORANDUM &**
        -against-                       :          **ORDER GRANTING**
                                        :          **PLAINTIFF'S MOTION**
SCIENT FEDERAL CREDIT UNION,            :          **FOR SUMMARY**
SPLIT DOLLAR AGREEMENT PLAN,            :          **JUDGMENT**
and SCIENT FEDERAL CREDIT               :
UNION, *as Administrator*,              :          3:22-CV-961 (VDO)
                                        :
                      Defendants.       :
---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

In this action concerning alleged improper denial of benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Plaintiff David Purcell sues Defendants Scient Federal Credit Union Split Dollar Agreement Plan (the "Plan") and Claimant Scient Federal Credit Union ("SFCU," and collectively with the Plan, "Defendants"), as administrator of the Plan, for denying the claim that he is 100% vested. Before the Court is Plaintiff's motion for summary judgment on his claim under ERISA § 502(a)(1)(B), as set forth in Count One of the Complaint, pursuant to Federal Rule of Civil Procedure 56. For the reasons described below, Plaintiff's motion for summary judgment is **GRANTED**.

## I.      BACKGROUND

The following facts are taken from Plaintiff's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Pl.'s 56(a)," ECF No. 42-11), Defendants' Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Defs.' 56(a)," ECF No. 47-1), the Complaint, and the record. The facts are recounted "in the light most favorable to" Plaintiff,

the non-movant. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021). The facts as described below are in dispute only to the extent indicated.

### A.    Factual Background

#### 1.    The Parties

Purcell was employed as the Chief Executive Officer ("CEO") of SFCU from June 2015 to March 16, 2020. (Defs.' 56(a) ¶ 1.) About two years after he became CEO, Purcell entered into an agreement with SFCU that required SFCU to offer Purcell "a retirement plan consistent with its offer of employment as its CEO and industry practices." (Compl. ¶ 7.)

Purcell and SFCU later entered into the Plan, which became effective on February 1, 2018. (*Id.* ¶ 8.) SFCU established the Plan, which is a form of deferred compensation known as a "split dollar" policy, for Plaintiff's benefit. (Defs.' 56(a) ¶ 2; Compl. ¶ 9.)

Under a "split dollar" policy, an employer generally purchases life insurance on the life of an employee. (Compl. ¶ 9.) "The employee is permitted to borrow a portion of the cash value of the life insurance policy under certain conditions, and the employer is repaid for the policy's premium payments, with interest, out of the cash value of the policy or through the death benefit paid on the policy." (*Id.*) Here, Purcell is the sole participant in the Plan, while SFCU's Board of Directors is designated as the Plan's administrator and fiduciary. (*Id.* ¶¶ 1, 3–4.) The Plan provides that SFCU will pay premiums on a life insurance policy owned by Purcell, and SFCU will be paid back out of the death benefit for the premiums it pays plus interest when the policy proceeds are paid. (Defs.' 56(a) ¶ 3.)

The amount Purcell is entitled to borrow under the Plan is called the "Annual Borrowing Cap." (Compl. ¶ 10.) The Plan provides that Purcell may access the Annual Borrowing Cap upon reaching retirement age on May 15, 2025, but that, in the event Purcell

is terminated due to a disability, he may access the Annual Borrowing Cap as of the date of his termination. (*Id.* ¶ 11.) The Plan defines "disability," in part, as "the Social Security Administration ["SSA"] determining that Purcell is totally disabled." (*Id.* ¶ 30; Pl.'s Mot. Ex. A, ECF No. 42-1 at 3.) The Plan further provides that Purcell becomes fully vested in the Annual Borrowing Cap by remaining employed by SFCU until the "Access Date," defined as the earliest of May 15, 2025, the termination of his employment due to death or disability, or any termination of employment within 24 months of a "change of control," as defined in the Plan. (Compl. ¶ 12.)

In addition, the Plan contains a vesting schedule providing that Purcell becomes partially vested in the Annual Borrowing Cap if his employment is involuntarily terminated for reasons other than death, disability, or change of control. (*Id.* ¶ 13.) Specifically, the Plan provides that Purcell is 0% vested if terminated before February 1, 2019; 33% vested if terminated after February 1, 2019 and before February 1, 2022; 67% vested if terminated after February 1, 2022 and before February 1, 2025; and 100% vested if terminated after February 1, 2025. (*Id.*; Pl.'s Mot. Ex. A at 3.)

In September 2017, Purcell disclosed that he suffered from Parkinson's disease on an application for the insurance policy funded by the Plan, a copy of which SFCU and the Administrator received. (Compl. ¶ 23; Defs.' 56(a) ¶ 17; Pl.'s Mot. Ex. G, ECF No. 42-7, at 4.) Purcell requested, and was granted, a reasonable accommodation of a standing workstation to address his symptoms. (Compl. ¶ 22.)

On March 16, 2020, SFCU informed Purcell that it was terminating him, stating "we are going in a different direction . . . it was a tough decision." (*Id.* ¶ 26.) When Purcell inquired about his benefits under the Plan, SFCU informed him that he was vested in one-third of the

Annual Borrowing Cap. (*Id.* ¶ 27; Defs.' 56(a) ¶ 24.) The SSA later determined that Purcell was disabled as of the date of his termination. (Compl. ¶ 29; Pl.'s Mot. Ex. B, ECF No. 42-2, at 5.)

**2.    Administrative Record**

In December 2021, Plaintiff filed a notice of claim with the Plan, asserting that he was 100% vested in the Annual Borrowing Cap because his employment had been terminated due to his disability. (*Id.* ¶ 32; Pl.'s Mot. Ex. B at 1.) The notice of claim asserted that SFCU had breached its fiduciary duties to Purcell by denying him benefits under the Plan and by failing to implement a loan interest rate deduction that had been approved by the SFCU Board of Directors Compensation Committee and which purportedly would have protected Purcell's benefits under the Plan. (Compl. ¶¶ 24, 33.) The notice included a determination letter from the SSA dated November 23, 2021. (Defs.' 56(a) ¶ 10; Pl.'s Mot. Ex. B at 4–5.)

The Plan, acting through Defendants' counsel, responded on February 4, 2022, stating that Plaintiff's termination was unrelated to his disability, that SFCU was unaware of his disability at the time of his termination, and requested a 30-day extension to March 6, 2022 to respond to the notice of claim as allowed by the Plan documents. (Defs.' 56(a) ¶ 11; Pl.'s Mot. Ex. C, ECF No. 42-3, at 1.) After the Plan failed to respond by the March 6 extended deadline, Plaintiff's counsel sent Defendants' counsel a letter on March 12, 2022, noting that Defendants had failed to respond to the notice of claim by the due date for a response. (Defs.' 56(a) ¶ 12; Pl.'s Mot. Ex. D, ECF No. 42-4, at 1.)

On March 15, 2022, Defendants' counsel responded to the notice of the claim, stating that that Plaintiff's medical documentation, the SSA determination, was not dispositive to show Plaintiff was disabled on the date of termination. (Defs.' 56(a) ¶ 13; Pl.'s Mot. Ex. E,

ECF No. 42-5, at 1 (asserting that the statement from the SSA "is not a determination that [Plaintiff's] employment was terminated as a result of his disability.").) The letter also stated that SFCU "did not terminate his employment on the basis of his being unable to perform his work because of a disability." (Pl.'s Mot. Ex. E at 2.)

On March 22, 2022, Plaintiff's counsel sent a letter asserting that the March 15, 2022 "does not constitute a denial letter that complies with either 29 CFR §[2560.503-1](g)(1(i) [sic] of the Department of Labor Claim Review regulations (the 'Claim Review Regulations') or Sections 10.3 and 10.5 of the Plan, as they require that a denial letter state the specific reason or reasons for the denial." (Pl.'s Mot. Ex. F, ECF No. 42-6, at 1.) Plaintiff's counsel then requested a denial letter that satisfied the Plan's obligations under the parties' agreement and the Claim Review Regulations. (*Id.* at 3.) Plaintiff then provided defense counsel with a physician's letter opining on Plaintiff's Parkinson's disease and the symptoms that people would have witnessed in Plaintiff. (Defs.' 56(a) ¶¶ 19, 20; Pl.'s Mot. Ex. I, ECF No. 42-9, at 2.)

### B.    Procedural History

After exhausting any administrative appeals (Defs.' 56(a) ¶ 25), Plaintiff filed the Complaint on July 29, 2022, alleging that Defendants violated sections 502(a)(1)(B) and 502(a)(3) of ERISA. (Compl., ECF No. 1.) In October 2022, Defendants filed an answer, which included two counterclaims asserted on behalf of SFCU. (Answer, ECF No. 20.) On March 3, 2023, before this action was transferred to this Court, the Honorable Sarala V. Nagala, U.S.D.J. granted Plaintiff's motion to dismiss SFCU's counterclaims and denied Defendants' motion to expand discovery beyond the underlying administrative record. (ECF

No. 39 (*Purcell v. Scient Fed. Credit Union Split Dollar Agreement Plan*, No. 3:22-CV-961 (SVN), 2023 WL 3259985 (D. Conn. May 4, 2023).)

On July 21, 2023, Plaintiff filed the instant motion for summary judgment on the remaining claims. (ECF No. 42.) Defendants opposed, and Plaintiff replied. (ECF Nos. 47, 48.)

## II.   **LEGAL STANDARD**

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[1] A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace,*

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

*Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson* 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for it. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

## III.   DISCUSSION

### A.   Standard of Review

As a threshold matter, the Court must determine the standard of review. Under Section 502(a)(1)(B) of ERISA, a "participant or beneficiary" is authorized to bring suit to "recover benefits due to him under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "'[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case an arbitrary and capricious standard applies." *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "Ambiguities are construed in favor of the plan beneficiary." *Krauss v. Oxford Health Plans,*

*Inc.*, 517 F.3d 614, 622 (2d Cir. 2008). Even where a plan has discretionary authority to determine eligibility for benefits or to construe the terms of the plan, however, "a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless" the plan **(1)** "has otherwise established procedures in full conformity with the regulation," and **(2)** "can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo*, 819 F.3d at 58.

Plaintiff contends that the standard of review for the denial of benefits at issue is *de novo* because of the following: **(1)** the written Plan document does not grant discretionary authority in a plan fiduciary to interpret and apply the Plan; and **(2)** even if there was a reservation of discretion, Defendants willfully failed to comply with the Department of Labor's claim-processing regulation. (Pl.'s Mem., ECF No. 42-10, at 4–8.) Defendants do not dispute Plaintiffs' contentions regarding the standard of review in their opposition brief. (*See generally* Defs.' Mem., ECF No. 47-2.) Defendants have therefore waived these issues. *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 103 (2d Cir. 2019) (finding an argument waived where a litigant did not argue in opposition to a motion); *see also Massie v. Wells Fargo Bank, N.A.*, No. 3:23-CV-01548 (VDO), 2024 WL 2314979, at *5 n.4 (D. Conn. May 22, 2024) (same).

Defendants' waiver aside, the Court finds that the record necessitates review by this Court under a *de novo* standard. "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995)). Absent from Defendants' opposition brief is any attempt to show that the

arbitrary and capricious standard must govern judicial review of the denial of benefits at issue. Therefore, considering the Second Circuit's guidance on the appropriate allocation of the burden of proof on whether there is deferential review, the Court holds that judicial review of the defendants' denial of benefits shall be *de novo*.

The Court's holding is consistent with the plain text of the written Plan documents. While "[a] reservation of discretion need not actually use the words 'discretion' or 'deference' to be effective, [] it must be clear." *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005) (quoting *Kinstler*, 181 F.3d at 251). "In general, language that establishes an objective standard does not reserve discretion, while language that establishes a subjective standard does." *Id.* The gravamen of the parties' dispute is whether Plaintiff is fully vested in the Annual Borrowing Cap due to a "termination of employment for death or Disability." (Pl.'s Mot. Ex. A, at 3 ¶ 4.3.1.) The Split Dollar Agreement defines "Disability" as:

> "(i) Purcell, by reason of any medically determinable physical or mental impairment that can be expected to result in death or to last for a continuous period of not less than 12 months, either (A) being unable to engage in any substantial gainful activity, or (B) receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Credit Union; or **(ii) the Social Security Administration determining that Purcell is totally disabled.**

(*Id.* at 1 ¶ 1.9 (emphasis added).) The unambiguous language in the Split Dollar Agreement provides an objective standard to determine whether Plaintiff has a disability, thus denying discretionary authority for Defendants to construe that term. Moreover, no text in the Split Dollar Agreement provides a subjective standard that invokes discretion for Defendants to determine eligibility for benefits. (*See generally* Pl.'s Mot. Ex. A.)

Accordingly, because the written plan documents fail to explicitly vest the plan administrator with discretionary authority, the Court proceeds to review the decision to deny

Plaintiff's benefits *de novo* and affords no deference to the administrative decision. *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011). "[T]he *de novo* standard of review applies to all aspects of the denial of an ERISA claim, including fact issues." *Kinstler*, 181 F.3d at 245. In conducting *de novo* judicial review, a court "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that []he is entitled to benefits under the plan[.]" *McDonnell v. First Unum Life Ins. Co.*, No. 10-CV-8140, 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013) (internal quotation marks and citations omitted). "However, regardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact." *O'Hara*, 642 F.3d at 117.

## B. The Administrative Record Shows That Plaintiff's Employment Was Terminated Because Of His Disability

The Second Circuit has held that the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applicable in ERISA cases where an employer's specific intent is at issue. *Giordano v. Thomson*, 564 F.3d 163, 169 (2d Cir. 2009) (specific intent in the context of retaliation case brought under ERISA § 510); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988) (specific intent in the context of discriminatory discharge case brought under ERISA § 510). Neither party disputes the use of the *McDonnell Douglas* framework in determining whether there was a termination of employment for disability in this case.

In accordance with the *McDonnell Douglas* burden-shifting framework, a plaintiff may first establish a *prima facie* case of discrimination by "produc[ing] minimal evidentiary support for the claim of discriminatory motivation." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). In the second stage, if the plaintiff establishes a *prima facie* case, "the burden of production shifts to the [defendant] to articulate a non-discriminatory reason for the adverse employment action." *Id.* A defendant's "explanation of its legitimate nondiscriminatory reasons must be 'clear and specific.'" *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)). At the third stage, once a defendant "has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the [defendant's] action was at least in part motivated by discrimination." *Davis*, 804 F.3d at 235. "[W]hile a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the [defendant's] stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the [defendant's] proffered reason." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024).

### 1.    Plaintiff's *Prima Facie* Case

Under the *McDonnell Douglas* framework, "a plaintiff establishes a *prima facie* case of unlawful termination by showing that the plaintiff (1) belongs to a protected group, (2) was qualified for the position, and (3) was discharged or denied employment under circumstances that give rise to an inference of discrimination." *Dister*, 859 F.2d at 1114–15. A plaintiff's burden of establishing his *prima facie* case is *de minimis. Id.* at 1114. As discussed below, the administrative record includes evidence that Plaintiff was disabled within the meaning of the Plan, that Plaintiff was qualified to perform his job, and that Plaintiff's employment was

terminated under circumstances giving rise to an inference that his termination occurred because of his disability.

### a.      Plaintiff Has A Disability As Defined By The Plan

At the outset, the Court finds that Plaintiff establishes that he has a disability within the meaning of the Plan.

Plaintiff contends that he is disabled as defined by the plan, citing the SSA's finding that he became disabled on March 16, 2020. (Pl.'s Mem. at 12.) Defendants do not directly dispute the SSA's determination. Instead, Defendants argue that the letter from Plaintiff's treating physician, Dr. Patel, establishes that Plaintiff has an impairment, as opposed to a disability. (Defs.' Mem. at 6.) Defendants also attempt to sidestep the SSA's determination by asserting that there is a genuine issue of material fact concerning the definition of the term "disability." (*Id.* at 7.)

But Defendants provide no evidence to dispute Plaintiff's condition or to show that Plaintiff does not satisfy the definition of disability. Absent from the administrative record is any evidence from Defendants that contradict Plaintiff's treating physician letter or SSA determination letter. Moreover, "[o]n *de novo* review, unambiguous language in an ERISA plan must be interpreted and enforced according to its plain meaning." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir. 2001) (internal citation and quotation marks omitted). The administrative record includes the Split Dollar Agreement, which defines "Disability" as including "the Social Security Administration determining that Purcell is totally disabled." (Pl.'s Mot. Ex. A at 1 ¶ 1.9.) The text is clear of any subjective language that could suggest ambiguity. And because the parties agreed to define "Disability" in the Plan, Defendants' reliance on *Cleveland v. Policy Management System Corporation*, 526 U.S. 795 (1999) to

assert that the definition of disability varies with context is inapposite. As such, in light of Plaintiff providing the SSA's letter determining that Plaintiff was disabled as of the date of his termination (Pl.'s Mot. Ex. B at 4–5), Defendant's contention that Plaintiff is not disabled is plainly inconsistent with the definition of disability contained in the Plan documents.

Accordingly, the Court concludes that Plaintiff has a disability within the meaning of the Plan.

### b.      Plaintiff Was Qualified For His Position

As for the second element of Plaintiff's *prima facie* case, there is no dispute that Plaintiff was qualified for the position he held. Approximately three years after he was hired as CEO of SFCU, and after an extended period of negotiation, Plaintiff and SFCU entered into the Plan, which became effective on February 1, 2018. (Compl. ¶¶ 6, 8.) In that agreement, the parties stipulated that Plaintiff was a valuable employee who should be encouraged to continue employment at SFCU. (Pl.'s Mot. Ex. A at 1 (Introduction).) SFCU thus agreed to offer Plaintiff "a retirement plan consistent with its offer of employment as its CEO and industry practices." (Compl. ¶ 7.) Plaintiff then continued to work as CEO for years, and the record includes unrebutted representations from counsel regarding Plaintiff's superior performance. (Defs.' 56(a) ¶ 1; Pl.'s Mot. Ex. F at 3.)

Accordingly, it is undisputed that Plaintiff was qualified to be CEO of SFCU.

### c.      Plaintiff Was Discharged Under Circumstances That Give Rise to An Inference Of Discrimination

Regarding the final element of Plaintiff's *prima facie* case, the Court finds that the sequence of events leading to, and timing of, Plaintiff's discharge contribute to an inference of discriminatory intent.

Plaintiff contends that he proved was terminated due to his disability, citing several evidence in the administrative record. First, Plaintiff cites the insurance application for the Policy, where he disclosed his Parkinson's disease diagnosis to Defendants. (Pl.'s Mem. at 13 (citing Pl. Mot. Ex. G).) Second, Plaintiff cites Dr. Patel's letter, which opined that the "increasing expression of the symptoms" would have been evident to anyone who interacted with Plaintiff on a regular basis. (Pl.'s Mem. at 13 (citing Pl.'s Mot. Ex. I at 2).) Third, it is unrefuted that Defendants began looking for Plaintiff's successor while Plaintiff's neurocognitive disorder progressed. (Pl.'s Mem. at 13 (citing Pl.'s Mot. Ex. F at 3).) Defendants contend that Plaintiff was terminated due to reasons unrelated to his disability. (Defs.' Mem. at 9–10.)

The Court finds that the administrative record conclusively demonstrates circumstances indicating discriminatory intent. The "inference of discriminatory intent could be drawn in several circumstances including, but not limited to:

> 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'"

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d. Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). The "timing of the discharge," standing alone, could contribute to "a permissible inference of discriminatory intent." *Chambers*, 43 F.3d at 37.

First, the administrative record is conclusive that, leading up to the termination, Plaintiff remained a valuable employee despite his worsening neurocognitive symptoms.

14

Purcell was employed as the CEO of SFCU from June 2015 to March 16, 2020. (Defs.' 56(a) ¶ 1.) Subsequently, during the underlying claims process, Plaintiff submitted a letter from Dr. Amar Patel, who treated Plaintiff for Parkinson's disease from October 2016 through November 2020. (Pl.'s Mot. Ex. I at 2.) As reflected in Dr. Patel's notes, Dr. Patel "observed the course of [Plaintiff's] illness which included increasing degrees of the cardinal features of Parkinson's disease," including bradykinesia (slow and small movements), rigidity (stiffness in the limbs), masked facies (a reduction in natural facial expression), stooped posture, hypophonia (soft speech), tremor in the left hand, and micrographia (small handwriting). (*Id.*) Dr. Patel further opined that the "increasing expression of the symptoms" would have been evident to anyone who interacted with Plaintiff on a regular basis. (*Id.*) The record also includes Plaintiff's disclosure to Defendants of his Parkinson's disease diagnoses (Pl.'s Mot. Ex. G at 4), and Defendants' agreement that Plaintiff was a valuable employee who should be encouraged to continue employment. (Pl.'s Mot. Ex. A at 1 (Introduction).) Plaintiff's employment was purportedly terminated for reasons unrelated to his Parkinson's disease but, in spite of multiple requests from Plaintiff's counsel, Defendants "did not respond to [Plaintiff] with documentation regarding the reason for his termination." *Purcell*, 2023 WL 3259985, at *9. In light of Plaintiff's employment being terminated while his neurocognitive symptoms were worsening, and despite being a valuable employee who was encouraged to continue on as CEO, the Court concludes that the "sequence of events leading to the plaintiff's discharge" indicates discriminatory intent. *Abdu-Brisson*, 239 F.3d at 468.

Second, as another independent basis for showing discriminatory intent, the administrative record is conclusive that the timing of Plaintiff's discharge resulted in substantial cost savings for Defendants. The parties agreed under the Plan that Purcell is 0%

vested if terminated before February 1, 2019; 33% vested if terminated after February 1, 2019, and before February 1, 2022; 67% vested if terminated after February 1, 2022, and before February 1, 2025; and 100% vested if terminated after February 1, 2025. (Pl.'s Mot. Ex. A at 3.) Defendants terminated Plaintiff's employment on March 16, 2020. (Defs.' 56(a) ¶ 1.) Because Plaintiff was discharged months before he was due to be 67% vested, double the amount he was currently vested, the timing of Plaintiff's discharge is sufficient to carry Plaintiff's *de minimis* burden to show discriminatory intent. *Dister*, 859 F.2d at 1115 (finding that an employee's discharge months before his pension rights were to vest and the resulting cost savings to the employer to be "circumstances sufficient to give rise to an inference of discrimination").

### 2.    Defendant's Legitimate Nondiscriminatory Reason for Termination

The Court finds that Defendants fail to satisfy the burden of producing admissible evidence sufficient to articulate a legitimate non-discriminatory explanation for Plaintiff's termination.

Plaintiff argues that his notice of claim states that his employment was terminated because of his disability and that there is no basis in the administrative record for a factfinder to conclude that there was any other reason for the termination. (Pl.'s Mem. at 12.) Specifically, Plaintiff contends that Defendants never asserted any reason for Plaintiff's termination despite sufficient opportunity for Defendants to respond to Plaintiff's claims during the administrative process. (*Id.* at 19.) On the other hand, Defendants contend that SFCU's decision to go in a "different direction" with an executive of the organization was a business decision. (Defs.' Mem. at 9–10.)

The Court's issue with Defendants' position, however, is Defendants fail to muster any evidence beyond nonspecific and conclusory representations from counsel to show that Plaintiff's termination was a legitimate business decision. Here, Defendants do not articulate a "clear and specific" reason for Plaintiff's termination. Defendants assert that there was a business decision for SFCU to go in a "different direction" with an executive of the organization (Defs.' Mem. at 9–10.) But asserting that an employer is going in another direction fails to "frame[] the factual issue with sufficient clarity to afford the employee a full and fair opportunity to demonstrate pretext." *Meiri*, 759 F.2d at 996–97. The Court again notes that, despite "ample opportunity to develop the record during the underlying claim process," Defendants "did not respond to [Plaintiff] with documentation regarding the reason for his termination." *Purcell*, 2023 WL 3259985, at *9. Instead of providing a denial letter stating the reasons for Plaintiff's termination, as Plaintiff repeatedly requested, the administrative record shows that Defendants breached the parties' agreement by failing to comply with deadlines governing the underlying claim process and providing the following representations from defense counsel:

1.    "It is our understanding that Mr. Purcell's termination from the Credit Union was for reasons unrelated to any disability and that [SFCU] was unaware at the time of termination of any claimed disability." (Pl.'s Mot. Ex. C at 1.)

2.    "It is important to note that at no time did Mr. Purcell advise [SFCU] that he had a disability while employed nor did he request any reasonable accommodation. Moreover, Scient did not terminate his employment on the basis of his being unable to perform his work because of a disability." (Pl.'s Mot. Ex. E at 2.)

The administrative record thus shows unclear and nonspecific representations, unsupported by any evidence, that are legally insufficient for Defendants to carry their burden of production to articulate a legitimate non-discriminatory reason for Plaintiff's termination. *Hannah v. Wal-*

*Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2016 WL 554771, at *12 (D. Conn. Feb. 11, 2016).

Accordingly, because "a plaintiff who proves the minimal *prima facie* case is entitled to prevail as a matter of law even without evidence that would support a reasonable finding of discriminatory motivation, if the employer does not come forward with a reason [for Plaintiff's termination]," summary judgment must be granted in Plaintiff's favor. *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000).

## IV.    CONCLUSION

For the reasons described above, Plaintiff's motion for summary judgment (ECF No. 42) is **GRANTED**. The denial of Plaintiff's application for benefits is **VACATED**. As to Count One of the Complaint, Plaintiff's claim pursuant to ERISA § 502(a)(1)(B), the case shall be remanded to Defendant Scient Federal Credit Union Split Dollar Agreement Plan solely for purposes of determining the amount of benefits due to Plaintiff with prejudgment interest consistent with this Memorandum and Order.

Within **fourteen (14) days** of this Order, the parties shall confer and file a joint status report regarding their intended next steps, including the request for attorneys' fees and costs (ECF No. 42), and prosecuting Count Two of the Complaint.

**SO ORDERED.**

Hartford, Connecticut
June 20, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge